### STIMSON MILL CO. et al. v. MORAN CO. et al.

### CHESLEY TOWBOAT CO. v. SAME.

(Circuit Court of Appeals, Ninth Circuit. January 3, 1910.)

#### No. 1,691.

TOWAGE (§ 15*)—INJURY TO TOW—COLLISION WITH DRY DOCK—LIABILITY OF TUG.

Findings of the trial court as to the circumstances under which a collision took place between a steamship and a floating dry dock to which she was being towed by two tugs, and that one of the tugs, the master of which was found to be in charge, was solely in fault, based on conflicting evidence, *held* sustained by the evidence and affirmed.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 36; Dec. Dig. § 15.*]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

Suit in admiralty by the Moran Company against the Chesley Towboat Company, which by petition brought in the Stimson Mill Company as owner of the tug Tillicum, and the Crosby Tugboat Company as owner of the tug Harold C. From the decree, the Chesley Towboat Company and the Stimson Mill Company appeal. Affirmed.

Libel against the Chesley Towboat Company for injuries sustained by the steamship Olympia and by the wharf and dry dock of libelant as the result of a collision alleged to have occurred through the negligence of the Chesley Towboat Company, respondent, and through want of sufficient power in the tugs Tillicum, and Harold C., employed by the said respondent to perform towage service for the libelant.

The libelant alleges that it owned a dry dock and a certain wharf in Puget Sound; that about January 14, 1907, the libelant made a contract with the Northwestern Steamship Company to repair the steamship Olympia at its dry

dock and shipbuilding plant in Seattle: that it became and was necessary to tow the Olympia from where she was moored in the harbor of Seattle to the shipbuilding plant of the libelant, and that the libelant employed the respondent, the Chesley Towboat Company, to tow the Olympia to libelant's shipyard, and that the tug Tillicum took the steamship Olympia in tow and attempted to bring her to the shipyard, and by reason of the two tugs employed being of insufficient power, and negligently and carelessly steered and handled, the tugs lost control of the Olympia, and, in consequence of the negligence and carelessness and want of sufficient power, the Olympia was carried by the wind and tide against the floating dry dock and wharf of the libelant; that, as a result of the collision with the floating dry dock, it was broken and damaged, and the wharf was damaged; that the Olympia was greatly damaged, and that in consequence of the collision libelant was obliged to expend various sums for repairs and materials.

The Chesley Towboat Company filed its petition, alleging, in substance, that at the special request of the Moran Company, libelant, petitioner engaged the tugs Tillicum and Harold C. to tow the Olympia from where the said steamship was then moored to the shipyard of libelant, and thereafter, in the performance of the towage service, the steamship came into collision with the dry dock and wharf and was injured; that the towage service was performed exclusively by the said tugs, operated, managed, and controlled by the officers and crew thereof, and that the collision was not caused or contributed to by any fault on the part of petitioner. Petitioner then set forth that the Moran Company had filed a libel against the petitioner, and pleaded that whatever damage, if any, had been sustained by the steamship and by libelant and its dry dock and wharf, if not caused by the sole negligence and fault of libelant itself, was because of the fault and negligence of the officers and crew of the tugs contributing thereto. Petitioner prayed that process might issue against the tugs Tillicum and Harold C., pursuant to the usual practice in admiralty. Process was accordingly issued.

The Harold C. and Crosby Tugboat Company answered, setting forth that the Harold C. was employed by the Chesley Towboat Company to aid some other and powerful tug in the work of moving the Olympia; that the Harold C. was under the control and direction of said tug, the Tillicum, so under the control of the Chesley Towboat Company, and acted under the direction of such other tug. All carelessness was denied. For further answer, it was set up that the Harold C. was a small boat, and her engines and equipment of such character as to render her unfit for moving large ships, and that when the Chesley Towboat Company sought the services of the Harold C. said company knew of the equipment and size of the Harold C., but that the Chesley Towboat Company requested the Crosby Tugboat Company to aid a larger and better equipped tug in towing the Olympia to the dock of the Moran Company, and that the Chesley Towboat Company was informed by the officers of the Crosby Tugboat Company that the Harold C. would not assume any responsibility whatsoever in moving the Olympia, but would render such aid as it reasonably might to a more powerful tug; that the tug Tillicum, accompanied by the Harold C., went to the place where the Olympia was moored, and the Tillicum went alongside of the Olympia, and attached herself thereto, and that her officers and crew took sole charge of the towage of the Olympia and directed the Harold C. and her officers and crew as to such services as the tug would render while moving the Olympia to the dock of the Moran Company: that, if any collision occurred, it was wholly without the fault of the Harold C., and that there was no negligence on the part of said tug or her officers and crew, for which she was liable. For further answer, it was set up that neither of the tugs was responsible for the injury to the Olympia or to the dry dock, and that there was no negligence on the part of either of said tugs, but that the injury was brought about because of the improper construction of the Moran dock, in that its apron, which was sunken and out of sight, extended out from the dock to a much greater distance than it should, and that the collision and damage to the Olympia and dry dock were caused wholly by the steamer coming in contact with such sunken apron, concerning which the tug having charge of the moving of the steamer had no knowledge

The Harold C. and the Crosby Tugboat Company answered the petition and libel of the Chesley Towboat Company, and set forth substantially that there was no negligence on the part of the Harold C., that no responsibility was assumed by the Harold C., and that control of the service was in the captain of the tug Tillicum. Denial of liability on the part of either of the tugs was also set forth, and allegations were made to the effect that the Olympia was injured by coming in contact with the sunken apron as heretofore referred to.

The Chesley Towboat Company, in answer to the libel of the Moran Company, set forth that neither of the tugs was owned, chartered, or operated by it, and that the Moran Company knew that each was operated and controlled by its respective owner; that the towage service was performed exclusively by the tugs operated and controlled by the owners, officers, and crews thereof, the master of the Tillicum directing the maneuvers of both tugs; and that the collision and damage were not contributed to or caused by any negligence or want of care on the part of respondent.

The Stimson Mill Company also answered the libel of the Moran Company, and denied that the tugs employed were negligently handled, or that they lost control of the Olympia, or that the Olympia was carried by the wind and tide against the floating dry dock and wharf of libelant. It also set forth that the Tillicum was employed by the Chesley Towboat Company to assist the Harold C. in moving the Olympia from a pier on the water front at Seattle to the pier or dock of the Moran Company, and that after the Harold C. had made fast to the Olympia the Tillicum was placed on the starboard quarter of the Olympia to assist in the towage; that thereupon the master of the Olympia asked the master of the Tillicum to come aboard the Olympia during the towage service, and that the master of the Tillicum went aboard the Olympia, and the steamship was moved out from the pier; that thereupon the master of the Olympia ordered the tugs to take the Olympia into the Moran dock, alongside of the north face thereof, stern first, and that the tugs turned the vessel around for the purpose of mooring her, stern first, as directed; that during the towage service the master of the Olympia was in command, and personally directed the movements of the tugs, and that the master of the Tillicum never was in charge, except by and through the instructions and orders given the tugs by the master of the Olympia; that the master of the Olympia directed the tugs to moor the Olympia, stern first, along the north face of the Moran wharf; that alongside said wharf, and distant a few feet therefrom to the westward was moored a floating dry dock belonging to the Moran Company, and that the face of the dry dock was about 8 feet to the south of the north line of the face of the wharf; that the dock was submerged, and that attached to the dry dock was a projection made of heavy timbers about 36 inches square and about 20 feet long, and that, at the time of the collision, the timbers were submerged, and that neither the master, nor any of the officers or crew of the Tillicum, knew of the existence of said submerged timbers, and that in moving the steamer into the dock, the steamship came into collision with a submerged and unmarked obstruction, and that thereupon the master of the Olympia directed the master of the Tillicum to work the engine of the Tillicum full speed astern, and that upon receiving such command the master of the Tillicum gave such order, and in backing the steamer, in grinding and wresting against the projection, a plate on the steamship was caught, and the damage and injury complained of were done; that the damage was solely caused by the fault and negligence of the libelant itself in maintaining a submerged projection from the floating dry dock without a mark, buoy, or warning, in the exact position where a vessel making a landing on the side of the dock would necessarily collide with the same.

The Stimson Mill Company also answered the petition of the Chesley Towboat Company, and denied that the towage service was managed and controlled exclusively by the officers and crews of the tugs. It admitted that whatever damage was done to the Olympia, or to the dry dock and wharf of the Moran Company, was through the sole negligence or the fault of the Moran Company itself. For further answer, it alleged that the tugs hereinbefore mentioned were employed to move the Olympia, and that after the Harold C. had made fast to the Olympia by a line about 75 feet in length from the bow of the steamer the Tillicum was placed on the starboard quarter of the Olym-

pia for the purpose of assisting in the towage. It is then set forth that the master of the Tillicum was asked to go onto the Olympia during the towage service, and that he went aboard; that the master of the Olympia directed the tugs and had personal direction of their movements. Respondent also sets forth the condition of the dry dock and the apron, and alleges that the collision and damages complained of were caused solely by the fault and negligence of the Moran Company in maintaining the submerged projection from the floating dry dock without a mark in a position where a vessel making a landing on the face of the dock would necessarily collide with the projection.

The testimony of all the parties was taken before a commissioner. The court found that the fault for the collision was attributable to the tug Tillicum, and made a decree in favor of the libelant, against the Chesley Towboat Company, for the aggregate amount of damages and costs, $4,331.52, and also made a similar decree in favor of the Chesley Towboat Company against the Stimson Mill Company for damages and costs, $4,331.52. The court dismissed the proceedings as against the Crosby Tugboat Company, claimant of the tug Harold C., with its costs, against the Chesley Towboat Company. From this decree, the Stimson Mill Company, claimants of the tug Tillicum, and the Chesley Towboat Company have each filed separate appeals.

W. T. Dovell and Hughes, McMicken, Dovell & Ramsey, for Stimson Mill Co.

M. M. Lyter and James Kiefer, for Moran Co.

William H. Gorham, for Chesley Towboat Co.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

HUNT, District Judge (after stating the facts as above). The first three specifications of error may be considered together. They relate to the finding of the court that neither the dry dock nor the apron projected north of the north line of the Moran wharf. This becomes important in considering whether it constituted a menace to vessels going to and from the wharf. If it did, then the Moran Company, the libelant, cannot recover for any damages. It cannot be successfully contended that the dry dock was a menace, unless it can be shown that it projected north of the north line of the wharf, lying directly in the way of vessels passing to and from the wharf. The court below found that the dock with its apron did not project north of the wharf and was therefore not a menace. This finding is amply supported by the evidence. Witness Croskey testifies that neither the dock nor the apron thereon did so project. Croskey was the captain of the Olympia, and was very well acquainted with the wharf, dock, and apron, in question. Robert Brown, chief engineer of the Olympia, corroborates the captain on this point. Frank W. Hibbs, superintending engineer, and a naval architect of 17 years' experience, who drew the chart and map of the wharf, dock, etc., positively asserts that the extreme northern point of the dock or apron was several feet south of the north side of the wharf. Both he and Capt. Croskey give very satisfactory and convincing reasons why they know that to be the fact. The testimony of W. E. McNally corroborates that of Croskey and Hibbs. Capt. Turner, a witness for the Crosby Tugboat Company, and captain of the Harold C., testified that he did not "think" the apron projected beyond the line of the wharf. J. F. Ives, for appellant, testifies that he and J. S. Primrose carefully measured the line of the wharf and dock the morning after the accident, and found that the

apron projected 12 feet beyond the north line of the wharf. J. S. Primrose corroborates Ives in every particular. The testimony of these two men sounds convincing, but no more so than the testimony of Croskey and Hibbs, who swear directly to the contrary. Primrose and Ives contradict Croskey, Brown, Hibbs, McNally, and Turner. It is impossible for us to reject the finding of the lower court upon the point.

The fourth and fifth assignments relate to the findings of the court to the effect that the Olympia struck the corner of the dry dock before she struck the apron. The testimony is very conflicting. Capt. Croskey of the Olympia testifies that his vessel struck the corner of the dock first, and then swung around and bumped the apron. Robert Brown, chief engineer of the Olympia corroborates Capt. Croskey. Capt. Charlesworth, of the Tillicum, however, testifies that the vessel struck the apron first, and afterwards drifted down on the corner of the dock. The captain said he could feel the vessel stop as she struck the submerged apron. The testimony of Anderson, mate of the Tillicum corroborates the captain's testimony in this regard. A witness named Conners, however, who saw the accident from the dock, corroborates the officers of the Olympia. Witness Hibbs, heretofore mentioned, testifies that it was a mathematical impossibility for the injury to the vessel to have been caused by striking against the apron. Witnesses Hibbs, Conners, and McAteer saw the dry dock after the accident, and all testify to injuries inflicted to the dock proper which indicate that it was struck a tremendous blow. The iron shoe on the northwest corner of the dock was broken and stained with fresh paint such as that found on the bottom of the Olympia. The distance and position of the shoe under water and the nature of the injury to the ship, point strongly to the probability of its having been the instrument which punched the hole in the hull. It appears too, quite clearly, that such an injury as was done could not have been inflicted by the blunt end of the apron. There seems, therefore, to be little doubt but that the injury to the Olympia resulted from the collision with the iron shoe fixed on the corner of the dry dock. It takes a blow of very great force to pierce the iron hull of a vessel of 1,730 tons, like the Olympia, and it hardly seems probable that the injury was inflicted after the force of the vessel's momentum had been broken by contact with the apron. The court's finding was justified and will not be set aside.

The other more material assignments of error relate to the question of the negligence which caused the accident, and who should be held responsible therefor. The lower court was of opinion that the accident was caused by the negligence of the person who was directing and controlling the movements of the vessels; and, further, that the captain of the Tillicum was directing and controlling them. The evidence shows that the entrance to the Moran dock, to which the Olympia was to be towed, was not dangerous, and that the ship could have been taken in safely if ordinary care had been exercised by the one directing the towing. The captain of the Olympia testifies that the collision and resulting injury to his ship were caused by the fact that the turn to send the vessel in stern first was made too late, and when

the vessel was too close to the dock. No proper allowance was made for the drifting of the ship, when it ought to have been known by the officer in charge that a vessel the size of the Olympia must lose head, if presented broadside to the force of the wind and tide. We must hold that it is established by the evidence that the injury to the vessel was caused by the culpable negligence of the officer in charge, and the court's findings to that effect must be sustained. It is also established by a preponderance of the evidence that Capt. Charlesworth of the Tillicum was in charge of the vessels during the towing. Witnesses Turner and Chesley testify to the custom of the port of Seattle that the captain of the tug lashed to the vessel shall take charge of and be responsible for it. Capt. Croskey of the Olympia testifies that he gave no orders or directions as to moving and handling of his vessel, except that relating to entering the ship stern first instead of bow first, and that the captain of the Tillicum, after lashing his boat firmly to the Olympia, came on board the Olympia and directed the moving of the vessel. The Olympia had no motive power of her own and was under the complete control of the two tugs. The captain of the Olympia was practically powerless—he could not move or guide his ship without assistance. The captain of the Tillicum denies that he had charge of the towing, but Capt. Brownfield, who employed the Tillicum and the Harold C., testifies that he told the captain of the Tillicum that he supposed that he (Charlesworth) would take charge, and Charlesworth said, "All right." It is certain that the captain of the Harold C. received all his orders from Capt. Charlesworth, although Charlesworth says that he merely transmitted the orders of Capt. Croskey to the Harold C., and gave no orders on his own initiative. Both captains, Charlesworth and Croskey, were on the deck of the Olympia and in equally favorable positions for giving orders to the Harold C. There seems to be no good reason to believe that the captain of the Olympia, if he gave any orders, would have transmitted them to the Harold C. by means of the captain of the Tillicum, yet it is plain that the Harold C. received no orders except those directly given by the captain of the Tillicum. The evidence supports the conclusion reached by the lower court, and will not be set aside. The Julia (D. C.) 91 Fed. 171; Gilchrist v. Sicken et al., 147 Fed. 170, 78 C. C. A. 12; Baker-Whitely Coal Co. v. Neptune Navigation Co., 120 Fed. 247, 56 C. C. A. 83.

There is no evidence whatever tending to establish negligence on the part of the captain of the Harold C., and the appellant's specifications of error in that regard are without substantial merit.

We do not deem further review of the evidence necessary. Finding none of the assignments of error to be well founded, our conclusion is that upon the whole case the District Court reached a just result.

Decree affirmed.